UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DAMIEN KIMBER STEWART,

    Defendant.

_____/

Case No. 25-20330

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE [17]**

Defendant Damien Stewart is indicted in this matter with two counts of possession with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 841(a); one count of unlawful possession of equipment used to manufacture a controlled substance in violation of 21 U.S.C. § 843(a)(6); one count of maintaining a drug premises in violation of 21 U.S.C. § 856; and one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Before the Court is Defendant's motion to suppress evidence. (ECF No. 17.) Defendant argues that the affidavit submitted in support of the warrant that led to the search of his residence failed to sufficiently establish a nexus between the residence and evidence of drug distribution. The government filed a response in opposition (ECF No. 20) and Defendant filed a reply. (ECF No 23.) The Court held a hearing on September 29, 2025. For the reasons below, the Court DENIES Defendant's motion.

**I.    Background**

The Drug Enforcement Administration (DEA) began investigating Defendant based on a tip provided on February 5, 2025, by a known source of information (SOI), that

1

Defendant was selling drugs from his residence on Conley Street in Detroit, Michigan. On February 11, 2025, DEA Task Force Officer (TFO) Kevin Daniels sought a warrant from a Wayne County, Michigan magistrate judge to search the Conley Street residence.

Daniels prepared an affidavit in support of the search warrant application, in which he described his experience working as a DEA TFO since June 2022 and as a police officer since 2013. He referred to his training in narcotics and money laundering investigations and his participation in approximately 100 drug-related arrests. Based on this experience and training, Daniels knows that drug traffickers keep and conceal records of their criminal activity, as well as their drugs and drug proceeds, in their residences. He also knows drug traffickers often sell more than one type of controlled substance.

Daniels' affidavit included the following information provided by the SOI. The SOI, who was "known" to agents, told DEA Group Supervisor (GS) Louis Scirri that Defendant used a pill press, located at his residence at XX Conley Street, to manufacture pills containing methamphetamine, ecstasy, and fentanyl. (ECF No. 17-1, PageID.57, Daniels Aff. ¶ 1.) The SOI stated that Defendant acquired the pill press from China, and used it to produce thousands of pills resembling Adderall and "blues." (*Id*. at ¶ 5.) Some of the pills contained fentanyl. *Id*. The SOI said that Defendant sold the pills to multiple customers, who he would meet either near or at his residence. (*Id*. at ¶ 8.) The SOI also stated Defendant kept a pistol at his residence. (*Id*. at ¶ 7.) The SOI told GS Scirri that the information he provided was based on "frequent face-to-face and telephonic interaction" with Defendant. (*Id*. at ¶ 2.)

TFO Daniels described how the agents verified some of the information provided by the SOI. The SOI positively identified Defendant and his residence from photographs

2

and agents verified Defendant's residence using state driver's license records. (*Id*. at ¶¶ 2-3.) The SOI described Defendant's vehicle as a gray Chrysler 300 sedan, which agents then confirmed through public records. (*Id*. at ¶ 4.) Daniels stated that agents knew from prior investigations that the blue pills described by the SOI were likely to be oxycodone. (*Id*. at ¶ 5.) Daniels also averred that he knew from prior investigations involving the illegal use of pill presses that illicit drug distributors often manufacture pills laced with fentanyl and sell them as oxycodone. *Id*. Agents verified Defendant had not been prescribed a controlled substance in the last five years. (*Id*. at ¶ 9.) They also discovered Defendant had prior convictions for possession of methamphetamine in 2006 and carrying a concealed weapon in 2018, and had a pending weapons offense in Wayne County. (*Id*. at ¶ 10.)

Daniels then described the surveillance conducted in the vicinity of XX Conley Street. On February 7, 2025, two DEA agents saw Defendant's car but no activity at Defendant's residence. (*Id*. at ¶ 11.) On February 8 at 1:05 p.m., the agents saw a Dodge Ram park in front of the residence and depart shortly thereafter. (*Id*. at ¶ 12.) At 1:16 p.m., the Dodge Ram returned. *Id*. The male driver exited the vehicle, knocked on the front door of the residence, and was let inside. *Id*. At 1:20 p.m., the male exited the residence and drove away. *Id*. At 1:32 p.m., a person matching Defendant's description exited the front door of the residence, entered Defendant's car parked in the driveway and drove away. (*Id*. at ¶ 13.) On February 10, 2025 at 3:28 p.m., agents observed Defendant's car park in front of XX Conley Street and a person matching Defendant's description enter the front door of the residence, using a key. (*Id*. at ¶ 14.) At 4:40 p.m., a black sedan pulled into the driveway of the residence. An unidentified male exited the vehicle, walked

to the front door, knocked, and was let into the residence. (*Id*. at ¶ 15.) Two minutes later, the male existed the residence, got into the black sedan, and drove off. *Id*. At 5:03 p.m., agents observed Defendant exit the residence, get into his vehicle, and depart the area. (*Id*. at ¶ 16.)

Based on the short duration of time the two unidentified people were inside Defendant's residence on February 8 and 10, Daniels averred that agents observed two "short stays." (*Id*. at ¶¶ 12, 15, 17.) Daniels stated that based on his training and experience, such "short stay" contact is a common indication of a narcotics sale. (*Id*. at ¶ 17.)

On February 11, 2025, at 4:00 a.m., agents conduced a trash pull from a garbage container in front of Defendant's residence. (*Id*. at ¶ 18.) Agents uncovered mail addressed to Defendant and two clear, torn plastic baggies. *Id*. The baggies were described as consistent with "corner ties," that Daniels has seen used by drug traffickers to package user amounts of cocaine." *Id*. The baggies field tested positive for cocaine. *Id*.

A Wayne County Assistant Prosecuting Attorney approved Daniels' affidavit and search warrant. A Wayne County magistrate judge signed the warrant on February 11, authorizing law enforcement officers to search XX Conley Street for evidence of illegal distribution of controlled substances, records of such, and the seizure of devises capable of storing such records. The search warrant was executed on February 12, 2025.

II.    **Legal Standard**

To determine whether probable cause for a search exists, the judge issuing a warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or

4

evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). There must be "a nexus between the place to be searched and the evidence sought." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (internal quotation marks and citation omitted). The relevant issue is not whether the owner of the property is suspected of a crime. *Id.* While the magistrate judge's determination of probable cause is owed "great deference," the reviewing court must "ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 236, 238-39 (internal quotation marks and citation omitted).

This Court's "review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (citation omitted). "The affidavit should be reviewed in a commonsense—rather than a hypertechnical—manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (citation omitted). This is so because a "factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality." *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). The Supreme Court has counseled that in close calls, doubtful warrants should be upheld to encourage law enforcement officers to seek warrants. *Gates*, 462 U.S. at 237 n.10.

**III.   Analysis**

Defendant argues that the four corners of the affidavit fail to establish a sufficient nexus between the alleged criminal activity and the Conley address. Specifically,

5

Defendant contends that the affidavit lacks credible evidence establishing probable cause to believe that evidence of drug manufacturing and distribution would be present at the residence at the time of the warrant's execution. The government responds that TFO Daniels' affidavit cleared the "modest probable cause bar" for the magistrate judge to sign the warrant authorizing the search of Defendant's residence based on the totality of the circumstances. *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024).

The Court starts by considering the information contained in the search warrant affidavit, while keeping in mind that each factor must be viewed as part of the totality of circumstances.

**A. Source of Information**

TFO Daniel's affidavit states that GS Scirri received the tip in this case from a "known source of information." (ECF No. 17-1, PageID.57 at ¶ 1.) Though the SOI is described as known to the agents, his reliability is not attested to in any detail in the affidavit. Still, an affidavit that provides little information concerning an informant's reliability may support a finding of probable cause under the totality of the circumstances if it includes sufficient corroborating information. *Woosley*, 361 F.3d at 927 (citing *Gates*, 462 U.S. at 241-45 and *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000)).

Here, the SOI provided a detailed tip that included specifics about the address where Defendant was manufacturing and distributing drugs, the specific types of drugs he was producing and selling, and his use of a press he obtained from China to make counterfeit pills. Agents corroborated some of the SOI's basic information, including Defendant's name and description, his residence and his vehicle. Agents also confirmed

Defendant had committed past crimes, including offenses involving drug possession and firearms.

In summary, the SOI was known to agents, provided detailed information, and a portion of the information was verified prior to the agents undertaking further investigation of Defendant. The affidavit outlines steps taken by agents to determine the reliability of the tip. *See Sanders*, 106 F.4th at 464. While the corroboration was not substantial, the affidavit does not rely solely on the SOI's tip, which is just one component of the totality of circumstances that the Court is to consider in this case. *Cf. United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (warrant affidavit relied exclusively on an informant's tip to show probable cause, so the credibility of the informant's tip was a central issue).

### B. Surveillance

After determining that the tip had some degree of credibility, agents set up surveillance and saw two different individuals briefly visit Defendant's residence while Defendant was inside. The officers' experience and training led them to conclude that what they witnessed were "short stays" and that narcotics transactions between Defendant and the individuals may have taken place.

The officers did not need to disprove possible innocent explanations for the short stays they observed on surveillance. *Wesby*, 583 U.S. at 61 ("[P]robable cause does not require law enforcement or judicial officers to rule out a suspect's innocent explanation for suspicious facts." The relevant inquiry is "whether a reasonable officer could conclude—considering all of the surrounding circumstances . . . —that there was a 'substantial chance of criminal activity.'") *Id*. (quoting *Gates*, 462 U.S. at 244, n.13.) Here,

7

what the officers observed was consistent with the information the SOI provided about Defendant selling narcotics to his customers from or near his residence.

### C. Trash Pull

The affidavit describes that following the results of their surveillance, officers conducted a trash pull and found two torn baggies of the sort used for packaging cocaine for distribution, and which field-tested positive for cocaine. The Sixth Circuit held that a warrant based on a trash pull alone was not supported by probable cause because the items found during the trash pull were insufficient to create a fair probability that drugs would be found in Defendant's home. *United States v. Abernathy*, 843 F.3d 243, 251 (6th Cir. 2016). However, where a trash pull is accompanied by other evidence, the Sixth Circuit has concluded that probable causes may exist. *See e.g.*, *United States v. Martin*, 526 F.3d 926, 930, 937 (6th Cir. 2008) (where officers corroborated the informant's tip that defendant was a drug trafficker, defendant had prior drug convictions, and drug evidence was recovered from trash pull, there was sufficient basis for establishing probable cause under the totality of the circumstances); *United States v. Spikes*, 158 F.3d 913, 918-19 (6th Cir. 1998) (probable cause existed where informant told police that house was site of drug trafficking, police saw drug trafficking activity at residence, and drug evidence was recovered from trash pull).

Here, the result of the trash pull, in conjunction with the evidence provided by the SOI and corroborated by the officers during their investigation, including surveillance of the residence, supports the reasonable inference that evidence of drug manufacturing and distribution would be found inside Defendant's residence.

### D. Nexus

Defendant suggests many things that could have verified the SOI's information, but that were not included in Daniels' affidavit, such as conducting controlled buys, witnessing hand-to-hand transactions, or stopping and searching the suspected customers. In addition, there was no information in the affidavit regarding how the SOI was "known" or whether he previously provided reliable information. But when evaluating a search warrant affidavit, courts are to look at what it contains as opposed to what it does not contain. *See Sanders*, 106 F.4th at 463 (citing *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000)).

As outlined above, Daniels' affidavit includes that a known source provided a detailed description of drug manufacturing and distribution by Defendant at his residence. Some of the basic information provided by the SOI was corroborated prior to opening an investigation. Days after receiving the tip, agents saw two short stays take place at Defendant's residence, while Defendant was inside the house. The agents' observations corroborated the information provided by the SOI. The trash pull, from a bin placed in front of Defendant's residence, took place approximately twelve hours after agents witnessed the last short stay. The affiant explained that suspected drug distributors may keep evidence of their illegal activity in their residences. The Sixth Circuit has made the same observation regarding known drug dealers. *See Higgins*, 141 F.4th at 815 (evidence of drug dealing is likely to be found where a suspected active drug dealer lives). Although Defendant was not a known drug dealer within the meaning of *Higgins*, such that an inference does not apply, the affidavit contains sufficient evidence to support TA Daniels' statement based on his own experience and training.

9

While there are certainly cases of affidavits supporting a stronger nexus, that is not the standard. The Court finds the affidavit in this case establishes sufficient nexus between the alleged criminal conduct and the Conley residence.

### E. Exclusionary Rule

Even if the search warrant was not supported by probable cause, the Court would not find suppression appropriate. The exclusionary rule does not bar the admission of evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905 (1984). Defendant alleges that the good faith exception does not apply to bare bones affidavits which contain only summary conclusions, suspicions, or unsupported beliefs instead of factual statements. *See McPhearson*, 469 F.3d at 525-26. Here, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" thus, the *Leon* good faith exception would apply. *See Leon*, 468 U.S. at 923 (internal quotation marks and citation omitted); *see also United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) ("We previously found *Leon* applicable in cases where we determined that the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched even if the information provided was not enough to establish probable cause.") (internal quotation marks and citation omitted).

## IV.   Conclusion

For the reasons above, the warrant was supported by probable cause. Alternatively, the *Leon* good faith exception would apply. Defendant's motion to suppress evidence is DENIED.

SO ORDERED.

s/Nancy G. Edmunds  
Nancy G. Edmunds  
United States District Judge

Dated: October 14, 2025